IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| K2 TRADING VENTURES, LLC, NEW VISTA, LLC, TAX MATTERS PARTNER,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | Nos. 04-1419T, 05-1067T<br>Judge Mary Ellen Coster Williams |

**REPLY TO UNITED STATES' PRETRIAL MEMORANDUM**

**Mark D. Allison, Esq.**
**Felix B. Laughlin, Esq.**
**John F. Collins, Esq.**
**Dewey Ballantine LLP**
**1301 Avenue of the Americas**
**New York, New York 10019**
**Telephone: 212/259-8000**

TABLE OF CONTENTS


Reply to United States' Pretrial Memorandum........1

I. The Government's Factual Inaccuracies........2

II. The Government's Inapplicable Legal Theories........6

A. Section 988 Regulations........6

B. Section 465 At-Risk Rules........8

C. Section 165 Loss Rule........10

D. Step Transaction Doctrine........11

III. The Government's Misapplication of Coltec........13

Conclusion........18

# TABLE OF AUTHORITIES

CASES

Coltec Indus., Inc. v. United States, 454 F.3d 1340 (Fed. Cir. 2006)..............13, 14, 15, 16, 17

Cornfield v. Commissioner, 797 F.2d 1049 (D.C. Cir. 1986) ....................................................10

Culbertson v. Commissioner, 337 U.S. 733 (1949)..............................................12

Dresser v. United States, 74 Ct. Cl. 55 (1932)...............................................................................10

Duke Energy Corp. v. United States, 49 F. Supp. 2d 837 (W.D.N.C. 1999) .........................16, 17

Falconwood Corp. v. United States, 422 F.3d 1339 (Fed. Cir. 2005) .........................................11

Hambrose Leasing 1984-5 Ltd. P'ship v. Commissioner, 99 T.C. 298 (1992) ..............................9

Hearst Corp. v. United States, 74 A.F.T.R.2d (RIA) 6385 (Fed. Cir. 1994) ................................11

Helvering v. National Grocery Co., 304 U.S. 282 (1938) ............................................................10

Jade Trading, LLC v. United States, No. 03-2164T ...................................................................3, 6

Laureys v. Commissioner, 92 T.C. 101 (1989).............................................................................8, 9

Maloney v. Commissioner, 25 T.C. 1219 (1956) ..............................................................................8

Olson v. United States, 172 F.3d 1311 (Fed. Cir. 1999)....................................................................9

Resser v. Commissioner, 62 T.C.M. (CCH) 617 (1991). ...................................................................9

Roberts v. Commissioner, 94 T.C. 853 (1990) ...................................................................................9

Sheppard v. United States, 176 Ct. Cl. 244 (1966).........................................................................11

Smith v. Commissioner, 78 T.C. 350 (1982) ......................................................................................8

Valley Waste Mills v. Page, 115 F.2d 466 (5th Cir. 1940)..........................................................8

TREASURY REGULATIONS

Treas. Reg. § 1.988-1(c) ......................................................................................................7

Treas. Reg. § 1.988-2(f)(1) ..................................................................................................7

Treas. Reg. § 1.988-2(f)(2) ..................................................................................................7

Treas. Reg. § 1.988-2(h) .....................................................................................................7

Treas. Reg. § 1.988-4 ...........................................................................................................7

Treas. Reg. § 301.6231(a)(3)-1(a) .....................................................................................9, 10

INTERNAL REVENUE CODE

Section 165.........................................................................................................................9, 10

Section 183...........................................................................................................................10

Section 465....................9, 10
Section 752....................7
Section 985....................7
Section 988....................7
Section 6226....................10, 11
Section 6231....................10, 11
Section 7491....................14, 16

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| K2 TRADING VENTURES, LLC, NEW VISTA, LLC, TAX MATTERS PARTNER,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | Nos. 04-1419T, 05-1067T<br>Judge Mary Ellen Coster Williams |

**REPLY TO UNITED STATES' PRETRIAL MEMORANDUM**[1]

When neither the facts nor the law support the government's arguments, it resorts to the pejoratives like "tax shelters" and "promoters" to describe the transactions and players involved. See, e.g., Def. Br. at 1-4, 6-8, 10, 14, 18-25, 27-28, 34, 42, 45-52. These pejoratives neither make up for the significant deficiencies in the government's case nor obscure the conclusion that both the facts and the law overwhelmingly support the investors' tax treatment of their legitimate investment activities.

To summarize, during May and June 2000 the investors in this case purchased and sold various call options in the form of spread options that were used to speculate on the direction of the Euro and British Pound currencies. By restriking their options the investors made cash profits -- approximately 12 percent in just one week -- and continued their investments thereafter. After the currencies stalled in their appreciation, in July 2000 Ari

[1] This reply brief is being filed pursuant to plaintiff's unopposed Motion for Leave to File Reply to Defendant's Pretrial Memorandum, filed on August 22, 2006. The Court has not yet issued an order in response to plaintiff's motion.

Pursuant to Section 14(c) of Appendix A of the Rules of the Court of Federal Claims, plaintiff will limit its reply to certain of the factual and legal inaccuracies of the defendant's brief that were not previously addressed by plaintiff in its pretrial memorandum.

Bergmann proposed the contribution and assignment of the options to a partnership named K2 Trading Ventures, LLC. This contribution and assignment served a number of non-tax investment objectives, including the diversification of the different strike prices of the options that would enhance the investors' ability to make money if the currencies did not rise as much as expected. With one exception, the investors have not realized any tax benefits from the transactions more than six years after the investments -- making it impossible for such investments to have been primarily motivated by tax benefits.

I. The Government's Factual Inaccuracies

The government apparently now concedes that the trades that were transferred to K2 Trading had profit potential, but contends that it was not reasonable for the investors to expect that K2 Trading could realize that potential. See Def. Br. at 19. The sole basis for such an assertion is the testimony of one of the government's experts who will testify that the investors should have expected a negative return on their investment based on his determination of the probabilities of profit. See Def. Br. at 20. Such testimony, coming from an expert who has never traded foreign currencies or foreign currency options, simply belies logic.[2]

The spread options entered into by the investors in this case only required a small upward movement in the Euro and British Pound currencies of about 100 pips (or about one cent) within one year in order for the investors to earn profits from just a static position and no restriking of the options. In contrast, with the dynamic trading strategy that the investors actually employed, virtually any upward movement in the spot prices of the currencies would allow for profit-taking through restriking of the options, as occurred here. In fact, since January

[2] The defendant admits that the "bulk" of the "story" in this case must be told through the partners of K2 Trading, yet insists elsewhere that their testimony is "self-serving." See, e.g., Def. Br. at 4, 16, 23. Given that the defendant lacks any evidence to contradict the anticipated testimony of the K2 Trading partners, its claim is quite incongruous.

1, 1999, the daily spot prices of the Euro and British Pound have moved upward by at least 100 pips about 90 percent of the time within any one year period. Moreover, one of the government's experts here previously testified in the Jade Trading case that spot prices move as much as 100 pips or more (in either direction) in a single day. Transcript of Record at 3124, 3134, 3137, Jade Trading, LLC v. United States, No. 03-2164T.

Additionally, most of the same investors in this case had benefited from such appreciation in the Euro when they made similar spread options investments during the summer of 1999. At that time, they reaped profits of as much as 16 percent or more in three weeks through restriking of the options as many as three times. These investors also made investments in spread options during November 1999 that generated a 100 percent return in just three months from the upward movement of the Euro. These successes led the investors in this case to invest in spread options again in May and June of 2000, which similarly led to substantial cash profits, as a result of appreciation in the Euro of about 250 pips and the British Pound of about 200 pips in just one week. Such facts provided an objective and reasonable basis for believing that the spread options transferred to K2 Trading also could reap the same profits as these investors had experienced previously.[3]

[3] The government suggests that there is no evidence of the amount of profit potential of the spread options through the investors' dynamic trading strategy of restriking of the options. See Def. Br. at 21-22. Such a claim is simply erroneous. In depositions in this case, both Mr. Bergmann and plaintiff's expert testified that there is no limit to the profit potential of spread options through restriking in this case because as long as the spot prices of the currencies are rising, the investors can restrike for profit with no transaction costs through the master trading agreement with AIG. Thus, unlike a static investment strategy in which investors buy and hold their investments and could only profit to the extent of the spread between the strike prices of the options, with a dynamic strategy investors can continually restrike and profit, without limitation, on the appreciation in the currencies.

The notion that the fees paid by the investors here to AIG should have diminished their expectation of profit potential is nonsensical.[4] The AIG fees eliminated the bid/ask cost that would have otherwise been borne by the investors, or subsequently by K2 Trading, on the trading of the options. Indeed, no such bid/ask cost was ever incurred by the investors or K2 Trading on the initial trades, the restriking of the options, or the closing out of the options. Further, the investors expected to restrike the options on multiple occasions during 2000, as they had done with their spread options investments in the summer of 1999. Thus, the AIG fees avoided the bid/ask cost that the investors otherwise would have incurred on each and every restrike, thereby substantially enhancing the profit potential of the options.

Because the government cannot overcome the fact that the investors in this case had a reasonable expectation of profit potential, it defaults to the claim that such profits were small relative to the amount of potential tax benefits associated with the investments. See Def. Br. at 22. Somehow, the government believes that such a comparison is informative of the tax motivation of the investors. It is not. Indeed, such a comparison is meaningless: the government's expert makes such a calculation based on the profit potential in the spread options by assuming that they are never restruck -- and compares that minimum profit potential with the maximum tax benefits that could have been claimed in the year of the investments, without regard to the tax benefits actually claimed to date.[5]

---

4 The government attempts to allocate the AIG fees in a manner that reflects a loss rather than the actual profits on the restriking of the spread options. See Def. Br. at 20. Such an allocation is wholly arbitrary and meaningless. The fees apply to all possible trading of the options, and the fees should not be allocated in a hindsight manner. The fees should be allocated over the amount of the restrikes that AIG would have allowed without charging a new fee -- which Mr. Bergmann testified at his deposition was between 20 and 50 restrikes. Such testimony is uncontroverted.

5 Defendant recklessly asserts that the investors who contributed or assigned spread options to Asuma Trading and K2 Trading used grantor trusts in order to "conceal huge paper tax

The government also makes the wild accusation that K2 Trading was formed for the purpose of generating tax losses to offset income from certain consulting agreements entered into by Sentinel Advisors with its clients. See Def. Br. at 3-4. Such an assertion does not fit the facts. First of all, the investors did not have any idea how much income would be earned from consulting agreements entered into with clients, and thus the spread options transactions could not have been "planned"[6] to offset income from such agreements.[7] Moreover, in order to have offset the income earned from consulting agreements in 2000, the investors would have had to withdraw from K2 Trading during 2000. However, other than Mr. Puramsetti, none of the other investors withdrew from K2 Trading until April 2001 – making it impossible for such investors to have utilized any potential tax benefits to mitigate their tax liabilities arising in 2000 from consulting agreements.

Finally, the government's assertion that K2 Trading was formed to generate tax losses ignores the fact that these investors have consistently used partnerships to manage their

---

shelter losses." See Def. Br. at 10. Such an allegation is baseless and libelous, to say the least. All of the trusts in this case (the government ignores the presence of one entity that was a family partnership, not a trust) were established for legitimate estate planning reasons and continue to serve as investment vehicles for all of the investors (or their children) in this case. Moreover, of course, other than with respect to Mr. Puramsetti, no losses have even been reported with respect to the property distributed from K2 Trading -- and thus it is impossible for anything to have been "concealed." But even with respect to Mr. Puramsetti and the other investors who were partners of Asuma Trading, the investors' tax returns quite plainly show the total amount and computation of the losses reported. The government's statements to the contrary are simply erroneous and have no foundation.

[6] Indeed, one of the purported "steps" of the spread options transactions, according to the government, is a "predetermined" loss needed to offset a gain from the sale of a business or investment. See Def. Br. at 5. The government has utterly failed to identify what the predetermined loss was that the investors were trying to generate here, particularly given that essentially no such losses have yet been incurred or claimed.

[7] Further, Mr. Puramsetti, one of the members of K2 Trading, was not a principal of Sentinel or its affiliates – only an employee. Thus, Mr. Puramsetti could not have enjoyed the benefit of any income earned from consulting agreements, and he did not.

investments. Plaintiff has produced information regarding a number of other investment partnerships that the members of K2 Trading invested in together[8] -- involving a range of private equity and other investment opportunities. These partnerships were neither structured for nor resulted in tax benefits to the members; and in one such partnership Mr. Bergmann contributed non-cash property and in other cases the members accepted distributions of non-cash property. The investments at issue in this case were no more the product of pre-planned steps as alleged by the government than existed in any other partnership involving these same members.[9]

II. The Government's Inapplicable Legal Theories

The defendant apparently has decided to ignore or abandon the FPAAs issued to the plaintiff in this case and introduce new legal theories as the basis for its positions. Such theories are wholly without merit and inapplicable, and were obviously conjured up after the IRS audit of K2 Trading in order to attempt to salvage an obviously bleak case for the defendant.[10]

---

[8] These partnerships included Sentinel Ventures, LLC, Mazal Trading, LLC, Mazal Strategic Trading, LLC, Mazal Strategic Funds, LLC, Everest Strategies, LLC, North River Ventures, LLC, CCV, LLC, and Tamarack Ventures, LLC, among others.

[9] Defendant wastes much of its pretrial memorandum discussing, inaccurately, Sentinel Advisors' relationship with BDO Seidman LLP, Sentinel's accountants, some of whose clients contributed and assigned spread options to partnerships managed by Sentinel. See Def. Br. at 4, 8-10, 21, 34, 51-52. The sole purpose of this discussion by the defendant is to attempt to shoehorn BDO Seidman and certain BDO clients as witnesses into the trial in this case despite their lack of involvement in or personal knowledge of the transactions at issue here. This obviously irrelevant and wasteful evidence is the subject of motions in limine being filed by the plaintiff simultaneously with this brief.

[10] Interestingly, despite the government's insistence in prior filings and statements to the Court that this case is identical to the facts of Jade Trading, LLC v. United States, No. 03-2164T, it nonetheless continues to argue that (i) the K2 Trading partnership did not exist (while admitting that the Jade Trading partnership existed) and (ii) the sold call options constitute liabilities within the meaning of Section 752 (an argument abandoned by the government in its Supplemental Memorandum for the United States on Application of Coltec Industries Inc. v. United States and Klamath Strategic Investment Fund, LLC v. United States filed in Jade Trading last month).

A. Section 988 Regulations

Although nowhere referenced in the FPAAs issued to the plaintiff, the government now argues that a regulation under Section 988 applies to require integration of the purchased and sold call options that comprise the spread options at issue in this case. The government ignores the problem that such regulation is inapplicable to the facts of this case.

Section 988 provides rules relating to the taxation of gains and losses arising from certain foreign currency transactions. Specifically, Section 988(a)(1)(A) requires that gains and losses from Section 988 transactions be treated as ordinary in character. The acquisition of an option with respect to foreign currency is a Section 988 transaction. I.R.C. §§ 988(c)(1)(A), (B), 985(b); Treas. Reg. §§ 1.988-1(c).

Section 988 and the regulations thereunder also provide rules with respect to the source of gains and losses from Section 988 transactions and the timing of their recognition. I.R.C. § 988(a)(3); Treas. Reg. §§ 1.988-4, -2(h).

The defendant now relies on Treasury Regulation Section 1.988-2(f)(1), which provides that, if the substance of a Section 988 transaction is different than its form, the timing, source, and character of gains or losses with respect to the transaction can be recharacterized in accordance with its substance. The regulations further provide that, in applying the substance-over-form principle, separate transactions may be integrated where appropriate -- for the purposes of determining the timing, source and character of the transactions. Treas. Reg. § 1.988-2(f)(1), (2).

None of the issues in this case relates to the timing, source, or character under Section 988 of gain or loss with respect to any of the Euro or British Pound options. Therefore, Treasury Regulation Section 1.988-2(f)(1) is inapplicable and the defendant provides no

authority to support its argument to integrate the spread options under such regulation. As clearly set forth in plaintiff's pretrial brief (see Pl. Br. at 27-33), authorities such as Valley Waste Mills v. Page, 115 F.2d 466 (5th Cir. 1940), Smith v. Commissioner, 78 T.C. 350 (1982), and Maloney v. Commissioner, 25 T.C. 1219 (1956), acq. 1956-2 C.B. 4, definitively provide, and the objective evidence will overwhelmingly demonstrate, that the spread options in this case constitute separate purchased and sold call options that cannot be integrated for any purpose.

B. Section 465 At-Risk Rules

Although nowhere referenced in the FPAAs issued to the plaintiff, the government now argues that the at-risk rules of Section 465 apply to limit the yet-to-be claimed losses of the individual investors in this case. Such an argument both substantively and procedurally violates well established judicial precedent.

Section 465(a)(1) generally provides that a taxpayer may deduct losses from an activity only if, and to the extent that, his investment in the activity is at risk. As a general matter, a taxpayer is treated as at risk with respect to the amount of money and adjusted basis of property the taxpayer contributes to the activity and certain borrowed amounts. I.R.C. § 465(b)(1), (2). A taxpayer is not at risk with respect to amounts that are protected against loss as a result of nonrecourse financing, guarantees, or other similar arrangements. I.R.C. § 465(b)(4).

The defendant appears to argue that K2 Trading (or its members) was not at risk with respect to the sold call options because the purchased call options protected it against loss. Such an argument, however, is inconsistent with judicial precedent that specifically has held that Section 465(b)(4) does not apply to spread options and that each of the options that comprises the spread must be recognized and treated as separate positions for purposes of that statute. See

Laureys v. Commissioner, 92 T.C. 101, 131 (1989), acq. in part, non-acq. in part, 1990-2 C.B. 1 (finding that spread options positions are not a "similar arrangement" within the meaning of Section 465(b)); Resser v. Commissioner, 62 T.C.M. (CCH) 617, 625 (1991) (same, citing Laureys).

Moreover, the defendant's argument is untenable as a jurisdictional matter. Specifically, the Court's jurisdiction in this proceeding is limited to the determination of K2 Trading's partnership items for the 2000 and 2001 taxable years, the allocation of those items as between K2 Trading's members, and the application of penalties, additions to tax, or certain other amounts. I.R.C. § 6226(f). Partnership items are items of income or deduction that are required to be taken into account for a partnership's taxable year, to the extent that regulations provide that such items more appropriately are determined at the partnership, rather than the partner, level. I.R.C. § 6231(a)(3); Treas. Reg. § 301.6231(a)(3)-1(a). Section 465, by its very terms, applies to individuals and certain corporations -- not to partnerships. I.R.C. § 465(a)(1). Courts have long held that the application of Section 465 is not a partnership item. Hambrose Leasing 1984-5 Ltd. P'ship v. Commissioner, 99 T.C. 298, 310-311 (1992) (finding that the Section 465 is applied in a partner-level proceeding); Roberts v. Commissioner, 94 T.C. 853, 861 (1990) (holding that partners' amounts at risk with respect to partnerships are not partnership items); Olson v. United States, 172 F.3d 1311, 1319 (Fed. Cir. 1999) (noting the government's concession that an at-risk determination is made at the partner level).

C. Section 165 Loss Rule

The government argues that Section 165 only allows losses or deductions to the extent the spread options investments were engaged in for profit. This issue is redundant to other issues in this case.

Section 165(a) generally provides that a taxpayer may deduct any loss sustained during a taxable year that is not compensated for by insurance or otherwise. The deduction under Section 165(a) is limited, however, to specified types of losses, including those incurred in a transaction entered into for profit. I.R.C. § 165(c).[11]

The defendant appears to confuse the application of the Section 165 test, at one point referring to the partnership's profit motives and at others referring to the individual members' profit motives.[12] In either case, the defendant's argument is simply erroneous and contradicted by the plain facts detailed in the plaintiff's pretrial memorandum and herein. As discussed above, these facts demonstrate the pretax profit potential of each of the spread options investments. Indeed, only small movements (i.e., approximately 100 pips, or one cent) in the Euro and British Pound currencies were necessary to obtain the maximum profit potential in the spread options, assuming just a static investment position. These profits were reasonably and objectively obtainable, as reflected by the cash profits generated by these investors through the restriking and trading of spread options in 1999 and 2000. The argument that somehow the

---

[11] Courts have applied different standards in determining whether the requisite profit motive exists. Helvering v. National Grocery Co., 304 U.S. 282, 289 n.3 (1938) (noting that the deductibility of losses under the predecessor of Section 165 may depend on whether the taxpayer entered into the transaction with a motive that was primarily profit-oriented); Dresser v. United States, 74 Ct. Cl. 55, 79 (1932) (stating that a taxpayer seeking a deduction under the predecessor of Section 165 must demonstrate that the transaction giving rise to the loss "was and reasonably might have been entered into for profit" (citation omitted)); Cornfield v. Commissioner, 797 F.2d 1049, 1051 (D.C. Cir. 1986) (providing that, for purposes of Section 183, a taxpayer is engaged in an activity for profit if he enters into the activity with an honest and actual profit objective).

[12] To the extent the defendant contends that Section 165(c) applies with respect to a particular investor, such an application is not a partnership item and may not be determined in a partnership-level proceeding. See I.R.C. §§ 6226(f), 6231(a)(3); Treas. Reg. § 301.6231(a)(3)-1(a). To the extent the defendant alleges in its brief that the issue is whether K2 Trading "entered into the offsetting options transactions for a profit motive," the government is relying on its erroneous and mistaken conclusion that the partnership engaged in such transactions rather than the individual members who subsequently contributed and assigned their spread options to K2 Trading.

investors had a reasonable expectation of a negative profit potential is belied by the fact that such small movements in the currencies were necessary to obtain profits. Any alternative investment strategy involving a larger spread between strike prices, as suggested by defendant's experts (one of whom has never traded foreign currencies or foreign currency options), would have only resulted in less profits or greater losses to the investors in hindsight. It is plainly obvious that the investors undertook their trades in spread options primarily for profit, particularly given that, with one minor exception, no tax benefits have been reported with respect to such investments.

D. Step Transaction Doctrine

Although not referenced in the FPAAs issued to the plaintiff, the defendant now argues that the step transaction doctrine, a judicially-created doctrine, applies to the facts of this case to allow the government to ignore (i) the transfer of the spread options by the investors to K2 Trading and (ii) the liquidating distributions by K2 Trading to the investors. However, the step transaction doctrine cannot be applied where, as here, the alleged steps each have independent economic significance.

The step transaction doctrine is a variation of the principle of substance over form. Under the doctrine, meaningless steps in a transaction may be ignored. Falconwood Corp. v. United States, 422 F.3d 1339, 1350 (Fed. Cir. 2005). Steps that have independent legal or economic significance, on the other hand, must be recognized. Hearst Corp. v. United States, 74 A.F.T.R.2d 6385 (Fed. Cir. 1994) (holding that the step transaction doctrine did not apply with respect to four charitable contributions, each made on a different date and having economic and legal significance, even though the contributions were part of an overall plan to donate an entire library). Transactions having legal or economic significance must be recognized even if such transactions give rise to tax benefits. Sheppard v. United States, 176 Ct. Cl. 244, 261 (1966).

The step transaction doctrine does not permit the generation of events that did not occur for the purpose of increasing tax liability. Id. at 256.

With respect to the transfer of the spread options to K2 Trading, each of the investors executed, along with AIG and K2 Trading, separate assignment and assumption agreements contributing and assigning their options positions to K2 Trading. AIG, an unrelated third party, reflected on its books and records that K2 Trading was the counterparty to the options positions and legally entitled to, and obligated by, the terms of those options, as the case may be. Further, it was K2 Trading, not the individual partners of K2 Trading, that subsequently closed out the options positions prior to expiration, and it was K2 Trading that received the cash proceeds from AIG as a result of such trades. The individual members received separate property (foreign currency and/or stock) from the partnership in liquidation of their positions, which property was distributed from foreign currency and brokerage accounts maintained by K2 Trading throughout its existence. Each of these actions had separate, independent legal consequences to the parties involved in the transactions and therefore cannot be ignored merely because the government makes blanket and unfounded assertions of a preplanned arrangement to generate tax benefits that, in fact, have for the most part never materialized.

As explained in the plaintiff's pretrial brief, the defendant attempts to argue that K2 Trading did not exist as a partnership for federal tax purposes. However, the Supreme Court's holding in Culbertson v. Commissioner, 337 U.S. 733 (1949), regarding the factors for determining the existence of a partnership for federal tax purposes, does not support the government's theory. Thus, the defendant now seeks to accomplish through the step transaction doctrine what it cannot do directly under the Culbertson analysis. However, either way, the defendant's attempts to ignore the existence of K2 Trading are simply of no avail when such

entity maintained legal rights and obligations separate and apart from its members. See Pl. Br. at 14-18.

III. The Government's Misapplication of Coltec

Not surprisingly, the government seeks to invigorate its weak case here by invoking the Federal Circuit's recent decision in Coltec Indus., Inc. v. United States, 454 F.3d 1340 (Fed. Cir. 2006), applying the economic substance doctrine. But the government has misapplied the Federal Circuit's holding to the facts of this case by assuming that the facts of Coltec are the same as those herein. The facts of Coltec are quite different than those present here, and therefore the government's reasoning fails again.

In Coltec, the Federal Circuit disallowed a loss that was generated through the disposition of high-basis, low-value stock of a subsidiary of the taxpayer, which subsidiary was allegedly formed to hold and manage certain of the taxpayer's potential asbestos liabilities. The Court held that although the transaction was technically consistent with a literal reading of the relevant Code provisions, the transaction lacked economic substance, and therefore should be disregarded for Federal income tax purposes.

In explaining its holding, the Federal Circuit first set forth what it considered to be the five "general principles" of the economic substance doctrine: (1) "although the taxpayer has an unquestioned right to decrease or avoid his taxes by means which the law permits," a taxpayer may not claim tax benefits from a transaction that "lacks economic reality;" (2) the taxpayer bears the burden of proving that the transaction has economic substance (although the Court was not faced with the application of Section 7491 which shifts the burden of proof to the government in the present case); (3) "the economic substance of a transaction must be viewed objectively rather than subjectively;" (4) the transaction to which the doctrine should be applied

is the one that "gave rise to the alleged tax benefit;" and (5) arrangements between related parties require "particularly close scrutiny." Coltec, 454 F.3d at 1355-58.

The economic substance doctrine has traditionally been interpreted by the courts as consisting of both an objective prong (pre-tax profit potential) and subjective prong (business purpose for entering into the transaction). The Federal Circuit's opinion in Coltec relies heavily on the objective prong of the test: "While the doctrine may well also apply if the taxpayer's sole subjective motivation is tax avoidance even if the transaction has economic substance, a lack of economic substance is sufficient to disqualify the transaction without proof that the taxpayer's sole motive is tax avoidance." Coltec, 454 F.3d at 1355 (citations omitted). In other words, the existence of a non-tax or investment purpose will not save a transaction if the transaction does not objectively affect the taxpayer's economic position. According to the opinion, a transaction will be considered to have economic substance if the transaction: (1) results in a "reasonable possibility of profit," (2) "var[ies] control or change[s] the flow of economic benefits," or (3) "appreciably affect[s] [the taxpayer's] beneficial interest except to reduce his tax." Coltec, 454 F.2d at 1352.

First of all, in its pretrial brief the government argues that "the economic substance analysis must focus exclusively on whether the offsetting options provided taxpayers with a reasonable possibility of economic profit." See Def. Br. at 19. We do not disagree with this statement. As explained above, the investors in this case had previously profited from the appreciation in the Euro and British Pound (during the summer and fall of 1999, and again in restriking the options at issue here in 2000). Thus, the evidence at trial will show that, whether the transaction being tested is the contribution and assignment of the options to the partnership or

a larger transaction, the investors did in fact have a reasonable expectation of generating a pre-tax profit from the transaction -- viewing it objectively rather than subjectively.

In addition to having a reasonable possibility of a pre-tax profit, the transfer of the options to the partnership, even if viewed in isolation, satisfied the other two indicia of economic substance set forth by the Federal Circuit in Coltec. By transferring the spread options to the partnership, the investors not only changed the flow of economic benefits among the parties, they also appreciably affected their beneficial interests. The transfer allowed for a diversification of the strike prices, which enhanced the investors' ability to make profits if the currencies did not move as much as hoped. Further, by transferring the spread options to a Sentinel-managed partnership, the partners received the benefit of the Sentinel traders' overseeing and having the ability to make trading decisions with respect to the investments. See Pl. Br. at 40-42.

Second, contrary to the government's claim in its pretrial brief, see Def. Br. at 15-16, the plaintiff does not bear the burden of proving that the investment strategy at issue in this case had economic substance. The taxpayer in Coltec was a corporation that was not subject to the provisions of Section 7491, the statute that Congress enacted to shift the burden of proof to the government in cases involving smaller taxpayers who satisfied certain requirements and introduced "credible evidence" with respect to the factual issues in the case. By stipulation filed with the Court today, the parties agree that the Court may assume that K2 Trading satisfies two of the three requirements of Section 7491, and defendant's counsel has indicated no dispute regarding the third requirement, but the parties disagree on whether "credible evidence" has been produced. Plaintiff has and will demonstrate that all such evidence has in fact been produced, which results in the burden of proof being borne by the defendant. See Pl. Br. at 48-50.

Third, because the Coltec opinion suggests that the lack of a business purpose might suffice to invalidate a transaction, the government's pretrial brief argues that the investors' "sole motivation was tax avoidance." See Def. Br. at 23-24. To the contrary, the evidence will show not only that the investment strategy satisfies the objective prong of the economic substance test, but also that the investors subjectively believed at the time that they entered into the strategy that there was a reasonable possibility of making a pre-tax profit. The existence of both subjective intent and objective economic consequences is more than sufficient to satisfy even the most rigorous formulation of the doctrine. The fact that the investors earned cash profits from their investments and that all but one have yet to claim any associated tax benefits demonstrates their subjective intent to realize a profit.

Finally, despite the government's concession that the trades that were contributed to K2 Trading had profit potential, it argues that such profit potential should be disregarded because it was de minimis relative to the expected tax benefits from the investment strategy. See Def. Br. at 22. As a factual matter, there is no way that the government can show that the profits earned by the investors were de minimis relative to the expected tax benefits because all but one of the investors have yet to claim any tax benefits from the transaction. The government pulls from the air a ratio of potential profits to potential tax savings based on a hypothetical scenario that bears little, if any, resemblance to the transaction at issue and was created by an expert who has no experience in foreign currency trading. Furthermore, as a legal matter, even if the potential profit from a transaction is smaller than the associated potential tax benefits, this does not mean, as the government suggests in its brief, that the transaction lacks objective economic consequences. See Duke Energy Corp. v. United States, 49 F. Supp. 2d 837, 844 (W.D.N.C.

1999) (upholding transaction despite relatively small amount of profit earned by taxpayer from investments in long and short positions in different kinds of preferred stock).

The fact that the investors utilized a partnership to make their joint investment when the Euro and British Pound currencies stalled in their appreciation, which also resulted in potential tax benefits, is not a reason to disregard the transaction. As the Federal Circuit in Coltec reaffirms: "there is a material difference between structuring a real transaction in a particular way to provide a tax benefit (which is legitimate), and creating a transaction, without a business purpose, in order to create a tax benefit (which is illegitimate)." Coltec, 454 F.3d at 1357. The Federal Circuit believed that the contingent liability transaction at issue in Coltec would not have occurred but for the tax benefits that the taxpayer was promised. By contrast, the investors in this case traded their options in order to make a profit, which they did, and when the currencies' appreciation faltered, they transferred the options to the partnership to improve their investment opportunities. The investors would have made these investments in K2 Trading even without regard to the potential tax benefits, which is confirmed by the lack of tax benefits claimed to date. These were real transactions even if they provided a potential tax benefit; they were not created without a business purpose solely to create a tax benefit.

**CONCLUSION**

For the reasons set forth in plaintiff's pretrial brief and this reply brief, the evidence will establish that the investments at issue in this case were conducted in order to generate pre-tax profits from the trading of foreign currency options and that the potential tax benefits that the government disputes, although understood by the investors, were not the predicate or the motivation for the investments in K2 Trading.

Respectfully submitted,

s/ Mark D. Allison

______________________________

Mark D. Allison
DEWEY BALLANTINE LLP
1301 Avenue of the Americas
New York, NY 10019-6092
Telephone: (212) 259-6866
Facsimile: (212) 259-6333
E-mail: mallison@dbllp.com

Felix B. Laughlin, Esq.
John F. Collins, Esq.

COUNSEL FOR PLAINTIFF

Dated: September 8, 2006